UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
03 JAN 15 AM 11: 23
U.S. DISTRICT COURT
N.D. OF ALABAMA

DARLA TILLERY, )
)
    Plaintiff, )
)
vs. )   Civil Action No. CV-01-S-2736-NE
)
ATSI, INC., )
)
    Defendant. )

**ENTERED**

JAN 15 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

    Plaintiff, Darla Tillery, alleges that her former employer subjected her to a religiously hostile work environment, and then terminated her because she did not conform her behavior to her supervisor's religious beliefs, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. The action presently is before the court on defendant's motion for summary judgment.

    Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but that it "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

        In making this determination, the court must review all evidence and make all
        reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that defendant's motion for summary judgment should be granted in part and denied in part.

## I. SUMMARY OF FACTS

Defendant, ATSI, Inc., "is a data communications contractor whose principal business is the installation of computer network cabling for grocery store retailers."[1] The company employs between ten and forty employees.[2] Plaintiff was hired as an office worker during August of 1998. She was promoted to office manager on September 29, 1999. Her immediate supervisor was Christopher Miller, the founder, "owner," and president of the defendant corporate entity.[3]

Miller is a member of St. Paul's Catholic Church in Athens, Alabama.[4] Significantly,

---

[1] Defendant's brief in support of summary judgment, at 7; plaintiff's evidentiary submissions, Tab 2 (Miller deposition), at 12.

[2] Plaintiff's evidentiary submissions, Tab 2 (Miller deposition), at 12. This is a wide swing in the numerical span and, if the number of persons normally employed by defendant is closer to the low end, it raises a red flag as to whether defendant is subject to suit under Title VII of the 1964 Civil Rights Act. "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . ." 42 U.S.C. § 2000e(b). "Title VII jurisdiction does not lie over a case in which the fifteen-employee minimum is not satisfied." 1 A. Larson and L. Larson, *Employment Discrimination* § 5.02[1], p. 5-8 (2002).

[3] Plaintiff's evidentiary submissions, Tab 2 (Miller deposition), at 12-13. While Miller acknowledged that he is "the owner of the company" at deposition, the record does not reflect the extent of his ownership interest (*i.e.*, whether Miller owns 100% of the outstanding shares of the corporation, a controlling interest, or otherwise).

[4] *Id.*., Tab 1 (Tillery deposition), at 60.

plaintiff's husband also is a Catholic.[5] Plaintiff's personal religious affiliation is not clear, but she was reared as a Baptist.[6] Throughout plaintiff's employment, Miller attempted to impress his religious beliefs upon her, as illustrated by the following incidents:

(1) Miller regularly invited plaintiff to attend his church.[7] Plaintiff and her husband accepted Miller's offer and attended one Sunday Mass.[8] The following day, Miller told plaintiff that "[i]t was nice to see you at church."[9] When plaintiff did not attend Mass on other occasions, however, Miller questioned her as to why he did not see her at church.[10] Plaintiff also stated that sometimes Miller "wouldn't speak to [her]," or he would tell her that she was "'f'-ing up.'"[11] Plaintiff inferred that Miller treated her this way because she had not attended church the prior Sunday.[12] Additionally, Miller sometimes would respond to plaintiff's absence by saying "[o]h, well," or that plaintiff "needed to pray."[13]

(2) About six months after plaintiff attended Miller's church, he asked her about her "illegitimate" children, who were fathered by a man that plaintiff never married.[14]

(3) During her second year of employment, Miller questioned plaintiff about her divorce from her previous husband, and voiced his opinion that she needed "'to get [her] marriage annulled' and ... unless [plaintiff's previous] marriage was annulled, [she] would never be able to belong to the [Catholic] church, because [she] was a divorced woman."[15] At a later date, Miller asked plaintiff "if [she] was going to pursue [her] annulment," and plaintiff replied "no."[16]

(4) Miller placed rosary beads and pamphlets near plaintiff's desk and asked her to

---

[5] *Id.*

[6] *Id.* at 74.

[7] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 64.

[8] *Id.* at 65.

[9] *Id.* at 68.

[10] *Id.* at 63-64.

[11] *Id.* at 80-81.

[12] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 80-83.

[13] *Id.* at 102.

[14] Plaintiff's deposition testimony as to what Miller said on this point is unintelligible: "[Miller] asked about my children, fathers of the children. And I just said I didn't talk about my father's — 'Well, they are illegitimate.' 'No, they are not. They are mine.'" (*Id.* at 71.) Miller also asked plaintiff "how could [she] do that?" (*Id.*)

[15] *Id.* at 72.

[16] *Id.* at 80.

"hand them out."[17] Plaintiff allowed the items to remain in her work area, but she refused to distribute them.[18] Miller also told plaintiff that she "needed to take them home, take some home to [her] kids, [her] family," and that she "needed one for herself."[19] While it is not clear whether plaintiff took any of the religious items home, she did hang a rosary on the wall near her desk.[20]

(5) After overhearing a conversation indicating that plaintiff was having trouble with her son, Miller asked her to tell him the specifics of the problem. Plaintiff told Miller that her son had grabbed her arm and bruised it. Miller then said "[y]ou need to get him in church and yourself in church."[21]

(6) When Miller discovered that plaintiff and her husband were having financial difficulties, he advised that "[m]aybe you should pray, it will help."[22]

(7) During the summer of 2000, Miller researched the visions of the Virgin Mary seen in Fatima, Portugal, around 1917.[23] He asked plaintiff to assist him by searching the Internet for information.[24] When plaintiff asked Miller who Fatima was, he said "[y]ou're stupid," and told her that she "would have learned it in church if you went to church."[25]

(8) On plaintiff's performance evaluation dated July 14, 2000, Miller wrote under the section entitled "supervisor's comments" that plaintiff should "keep going to church, seek God 1st[;] all other things will come." Plaintiff received a score of 86 out of 100, or a "B+," on the evaluation.[26]

(9) In plaintiff's termination letter dated January 18, 2001, Miller stated that "after great prayer to God and anguish of Heart I have come to the decision that your position here with ATSI, Inc., be terminated." Miller also used the closing "Your Brother in Christ" and, in a postscript, wrote: "I strongly suggest you talk with God, just take some time by yourself and talk with him, no formal prayers required. If you'd like the Lord's prayer always helps me to open up to our heavenly Father." Miller then

---

[17] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 73.

[18] *Id.* at 106.

[19] *Id.* at 107.

[20] *Id.*; defendant's evidentiary submissions, Tab 2 (Miller deposition), at 72.

[21] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 98-99.

[22] *Id.* at 99-100.

[23] Plaintiff's evidentiary submissions, Tab 2 (Miller deposition), at 75.

[24] *Id.*, Tab 1 (Tillery deposition), at 104.

[25] *Id.* at 105.

[26] *Id.* at Exhibit 8 (Tillery performance evaluation), at 2-3 (underlining in original).

set forth the Lord's prayer, with citations to scripture.[27]

One of plaintiff's principal duties as office manager was to prepare and send invoices to defendant's clients.[28] The timely delivery of invoices is crucial to both defendant and its clients, for obvious reasons of budgeting, accounting, and profitability.[29] In fact, plaintiff routinely sent invoices by Federal Express two-day delivery service in order to ensure timely delivery.[30]

Plaintiff did not work on January 15, 2001, due to illness. In her absence, Kim Prater, defendant's warehouse manager, performed plaintiff's office manager duties.[31] While looking for a telephone book in plaintiff's desk, Prater discovered over 130 "original" invoices, totaling more than $200,000 owed to defendant.[32] The invoices were all dated between October 11, 1999 and January 10, 2001.[33] Ordinarily, original invoices were sent to clients on the same dates typed on the invoices.[34] Prater quickly informed Miller of her discovery.[35] Miller checked company records to determine the status of the accounts, and confirmed that none of the invoices found by Prater had been paid. He then telephoned several clients, and learned that none had received invoices.[36] Miller concluded that plaintiff had failed to process these invoices, and terminated her on the next day that he had an opportunity to speak with her about the incident, January 18, 2001.[37] (Plaintiff only worked a few hours on January 16 and 17 due to her illness, and Miller testified that, as a

---

[27] *Id.*, Tab 2 (Miller deposition), at Exhibit 5 (Tillery termination letter).

[28] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 37-48.

[29] *Id.*, Tab 2 (Miller deposition), at 105-06.

[30] *Id.*, Tab 1 (Tillery deposition), at 57-58.

[31] *Id.* at 102.

[32] *Id.* at 92-93; defendant's evidentiary submissions, Tab 6 (Tillery deposition), at Exhibit 4 (ATSI invoices).

[33] *Id.*

[34] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 57-58.

[35] *Id.*, Tab 2 (Miller deposition), at 93-94.

[36] *Id.* at 98-101.

[37] *Id.* at Exhibit 5 (Tillery termination letter).

consequence, he did not want to confront her on either of those days.[38])

Plaintiff alleges that she was wrongfully terminated, saying the invoices found by Prater actually were *copies* of "resubmits" that Miller had asked her to prepare, as opposed to *original* invoices that had never been sent to customers.[39] (During deposition, Miller defined "resubmits" as a "broad term" used to describe the "infrequent" practice of preparing a second invoice when "the client never got an original invoice[,] or if they got an original invoice and lost it."[40])

## II. DISCUSSION

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, *religion*, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis supplied). The term "religion" is defined as including "all aspects of religious observance and practice, as well as belief, unless the employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). As noted in the beginning of this opinion, plaintiff's personal religious affiliation is not clear, but she was reared as a Baptist. Even so, Title VII protects persons who are not members of organized religious groups, *see International Association of Machinists & Aerospace Workers v. Boeing Co.*, 833 F.2d 165, 169 (9th Cir. 1987), as well as atheists. *See Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 142 & n.3 (5th Cir. 1975).[41]

---

[38] *Id.* at 107.

[39] Plaintiff's evidentiary submissions, Tab 1 (Tillery deposition), at 232-33.

[40] *Id.*, Tab 2 (Miller deposition), at 85.

[41] The fact that the First Amendment to the United States Constitution and Title VII of the Civil Rights Act of 1964 protects even the rights of atheists, those who believe that God does not exist, reflects the founding principles of this Nation, grounded in the firm belief that *freedom of conscience* is among the fundamental, "inalienable rights" of

A.     **Termination**

As in any other discriminatory discharge case, plaintiff can establish that she was discharged on the basis of her religion, or lack thereof, with either direct or circumstantial evidence. Plaintiff claims that she has "direct evidence that she was terminated from her position with ATSI because of her failure to attend church with her boss and her failure to properly respond to her bosses [sic] inquiries about her personal life and religion."[42] This court disagrees.

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"). The standard for proving discriminatory intent by direct evidence is a stringent one, however, and only the most blatant comments will suffice. *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). "The most obvious and compelling example" of such evidence in the context of a case in which the plaintiff contends that she was discharged on the basis of her religion "would be a remark to the effect that . . . 'I'm firing

---

humankind, "to which the laws of nature and of nature's god entitle them." THE DECLARATION OF INDEPENDENCE para. 1, 2 (U.S. 1776). For a brief, but useful, discussion of this subject, see WALTER BERNS, MAKING PATRIOTS 23-46 (2001).

[42] *Id.* at 15.

you because you're not a Christian.'" *Venters v. City of Delphi*, 123 F.3d 956, 972-73 (7th Cir. 1997). Here, none of Miller's religious statements or actions rise to that level.

In the absence of direct evidence, plaintiff must rely upon circumstantial evidence and navigate the burden-shifting analysis first promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Under that now familiar framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *see also Burdine*, 450 U.S. at 253-54 & n.6, 101 S. Ct. at 1093-94 & n.6. If plaintiff succeeds in establishing a prima facie case, it gives rise to a presumption of discrimination, which shifts to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action. *See, e.g., Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094; *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). To rebut the presumption of intentional discrimination raised by a plaintiff's demonstration of a prima facie case, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255, 101 S. Ct. at 1094. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Burdine*, 450 U.S at 257, 101 S. Ct. at 1096, the presumption of discrimination created by the prima facie case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10, 101 S. Ct. at 1094-95 & n.10. The burden then shifts to the plaintiff to "come forward with

evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated"). If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S. Ct. at 2106.

The elements of a prima facie case differ, depending upon which theory of religious discrimination a plaintiff pursues. "[A] plaintiff in a Title VII religious discrimination action has two legal theories available for the prosecution of his claims: 'disparate treatment' and 'failure to accommodate.'" *Breech v. Alabama Power Co.*, 962 F. Supp. 1447, 1456 (S.D. Ala. 1997), *aff'd*, 140 F.3d 1043 (11th Cir. 1998); *see also Wilshin v. Allstate Insurance Co.*, 212 F. Supp. 2d 1360, 1370-71 (M.D. Ga. 2002) (same) (citing *Chalmers v. Tulon Company of Richmond*, 101 F.3d 1012, 1017-18 (4th Cir. 1996)).

When a plaintiff alleges that an employer failed to reasonably accommodate a requirement of her particular religion, the plaintiff must demonstrate that: (1) she had a bona fide religious belief that conflicts with an employment requirement; (2) she informed her employer about the belief and the conflict; and (3) she was discharged or disciplined for failing to comply with the conflicting

employment requirement. *E.g., Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 n.2 (11th Cir. 2002) (collecting cases from other circuits); *Wilshin*, 212 F. Supp. 2d at 1372; *Breech*, 962 F. Supp. at 1459; *see also* 42 U.S.C. § 2000e(j).[43] This is not an accommodation case, however.

When a plaintiff alleges that she was subjected to disparate treatment because of her religious beliefs, she must establish the following prima facie elements: (1) she was a member of and/or practiced a particular religion; (2) she was qualified to perform her job; (3) she was subjected to an adverse employment action; (4) defendant treated similarly-situated employees outside plaintiff's religious class more favorably; and (5) the person who made the decision to impose the adverse employment action upon plaintiff was aware of her religious beliefs. *See Lubetsky*, 296 F.3d at 1305-06;[44] *Wilshin*, 212 F. Supp. 2d at 1371 (citing *Breech*, 962 F. Supp. at 1457; *Gunning v.*

---

[43] As observed in the beginning of this discussion, 42 U.S.C. § 2000e(j) defines the term "religion" as including "all aspects of religious observance and practice, as well as belief, *unless the employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.*" (Emphasis supplied.)

[44] The Eleventh Circuit's recent decision in *Lubetsky*, discussing the prima facie elements of a disparate treatment religious discrimination claim in the context of a case in which a Jewish plaintiff alleged that the defendant had failed to hire him because of his religion, added the fifth element to the prima facie formulation. The *Lubetsky* Court wrote as follows:

> As a general matter, under the four-pronged *McDonnell Douglas* framework, a prima facie case of intentional discrimination using circumstantial evidence is established if the plaintiff shows: (1) he is a member of a protected class; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected for employment; and (4) after the rejection, the employer continued to seek applicants with the plaintiff's qualifications outside of plaintiff's particular protected class. 411 U.S. at 802, 93 S. Ct. at 1824.
>
> More specifically, where intentional religious discrimination under Title VII is alleged, *a prima facie case is established if the plaintiff demonstrates the challenged employment decision was made by someone who was aware of the plaintiff's religion. See generally Beasley v. Health Care Serv. Corp.*, 940 F.2d 1085, 1088 (7th Cir. 1991) (noting the prima facie case for discriminatory discharge based on a plaintiff's religious practices is established by showing: (1) the practices are religious in nature; (2) the plaintiff called the religious practices to the employer's attention; and (3) the religious practices were the basis of the plaintiff's discharge); *cf. Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005-07 (7th Cir. 2001) (holding plaintiff failed to establish a prima facie case of pregnancy discrimination even though she was visibly pregnant where she could not prove the person who decided to terminate her employment knew she was pregnant); *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580-82 (3d Cir. 1996) (holding plaintiff failed to establish a prima facie case of pregnancy discrimination even though she told six co-workers she was pregnant where she could not provide any evidence the person who decided to terminate her employment knew she was pregnant);

*Runyon*, 3 F. Supp. 2d 1423, 1428 (S.D. Fla. 1998)).

Neither of the foregoing prima facie formulations are entirely satisfactory in the context of this case, however — a case in which plaintiff alleges that she was fired because she did not share the religious beliefs of her employer, Christopher Miller, or conform her behavior to his proselytization. In such circumstances, as the Seventh Circuit observed, plaintiff "need only show that her perceived religious shortcomings (her unwillingness to strive for salvation as [Miller] understood it, for example) played a motivating role in her discharge." *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997) (citing 42 U.S.C. § 2000e-2(m)[45]); *see also Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033, 1038 (10th Cir. 1993) (holding that, "in order to establish a prima facie case in actions where the plaintiff claims that he was discriminated against because he did not share certain religious beliefs held by his supervisors, . . . the plaintiff must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's

---

*Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987) (concluding the *McDonnell Douglas* elements did not rationally create an inference of intentional discrimination even though plaintiff filled out an application for employment and checked a box indicating his race, where plaintiff offered no evidence the decision-makers knew or saw the information concerning his race). *Accordingly, an employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion. See Robinson*, 847 F.2d at 1316 (indicating plaintiff could not establish a prima facie case where there was no evidence the decision-maker knew plaintiff belonged to a protected class). *Therefore, when we evaluate a charge of disparate treatment employment discrimination, we must focus on the actual knowledge and actions of the decision-maker. Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002), citing *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001).

*Lubetsky v. Applied Card Systems*, 296 F.3d 1301, 1305-06 (11th Cir. 2002) (emphasis added) (footnote omitted).

[45] 42 U.S.C. § 2000e-2(m) provides: "Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

religious beliefs").

Ultimately, however, it does not matter which prima facie formulation is applied because, even assuming that plaintiff carried her burden in that regard, she still has not established that defendant's stated reason for her termination is pretextual.

Defendant says that plaintiff was terminated only after it was discovered that she had failed to forward more than 130 invoices to customers, totaling in excess of $200,000 owed to the company. In support of its assertion that plaintiff did not transmit the invoices, defendant submitted the affidavit of one of its customers, stating that his company did not receive several of the invoices that plaintiff claims to have mailed. Plaintiff's only response to this evidence is to assert her innocence. Such a denial does not prove that defendant's proffered reason is pretextual because, even were it conceded that plaintiff actually did transmit the disputed invoices, the relevant inquiry is whether Miller believed that plaintiff had not done so when he terminated her. *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n. 3 (11th Cir. 1999) (holding that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct"); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) ("Pretext is not demonstrated by showing simply that the employer was mistaken.") (citation omitted); *cf. E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (holding that the plaintiff "could properly be discharged based on Defendant's good faith belief that she lied in an internal investigation.") (citations omitted). The record reflects that, on the date Miller terminated plaintiff, he had been told by at least one of his customers that the disputed invoices *had not* been received.[46] Such information gave Miller a good-faith basis for believing that

---

[46] Defendant's evidentiary submissions, Tab 3 (Ward affidavit) ¶ 7.

plaintiff had been derelict in the performance of her duties.

Further, plaintiff cannot demonstrate that defendant's proffered legitimate, non-discriminatory reasons for her termination are not worthy of belief simply by quarreling with her employer's business judgment.

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. . . . We have recognized previously and we reiterate today that:
>
>> [f]ederal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the relevant federal civil rights statute] does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)) (other citations omitted); *see also, e.g., Denney v. City of Albany*, 247 F.3d 1172, 1186 n.8, 1188 (11th Cir. 2001); *Damon*, 196 F.3d at 1361 ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair.") (internal citation omitted). Accordingly, plaintiff's discriminatory termination claim is due to be dismissed.

**B.     Hostile Work Environment**

Title VII, as previously noted, prohibits employment discrimination against an individual with respect to her "compensation, *terms, conditions, or privileges of employment*, because of such individual's race, color, *religion*, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis

supplied). As the Supreme Court observed in *Meritor Savings Bank, FSB v. Vinson*, "the phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . .' in employment." 477 U.S. 57, 64, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49 (1986) (citations omitted).

> Consequently, the reach of Title VII is not limited solely to discrimination that can be described as "economic" or "tangible." *Meritor*, 477 U.S. at 64, 106 S. Ct. at 2404. It extends to workplace harassment that is attributable to the plaintiff's sex, as *Meritor* made clear, *as well as to her religion*. *Id.* at 66, 106 S.Ct. at 2405 (citing *Compston v. Borden, Inc.*, 424 F. Supp. 157 (S.D. Ohio 1976)); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993); *Iovin v. Northwestern Mem. Hosp.*, 916 F. Supp. 1395, 1409 (N.D. Ill. 1996) (Castillo, J.); *Shapiro v. Holiday Inns, Inc.*, 1990 WL 44472, *9 (N.D. Ill. April 6, 1990) (Kocoras, J.); *see also, e.g., Ellis v. Wal-Mart Stores, Inc.*, 952 F. Supp. 1513, 1518 (M.D. Ala. 1996); *Goldberg v. City of Philadelphia*, 65 Empl. Prac. Dec. para. 43,221, 1994 WL 313030, *10-11 (E.D. Pa. June 29, 1994); *Turic v. Holland Hospitality, Inc.*, 849 F. Supp. 544, 551 (W.D. Mich. 1994), *aff'd. in part & rev'd in part on other grounds*, 85 F.3d 1211 (6th Cir. 1996); *Turner v. Barr*, 811 F. Supp. 1, 2 (D.D.C. 1993); *Weiss v. United States*, 595 F. Supp. 1050, 1056 (E.D. Va. 1984).

*Venters v. City of Delphi*, 123 F.3d at 974-75 (emphasis supplied).

While the Eleventh Circuit apparently has not addressed a hostile work environment claim based on a plaintiff's religion, this court finds that the test applied to hostile work environment claims based on other prohibited characteristics (*e.g.*, sex, race, or national origin) is equally applicable to the assessment of a religiously-hostile work environment claim. *See id.* at 975 (observing that, "as *Meritor* itself reveals, the federal courts have been applying hostile environment principles to harassment based on race, religion, and national origin as well as sex in the twenty-five years since the Fifth Circuit's ground breaking decision in *Rogers v. E.E.O.C.*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S. Ct. 2058, 32 L. Ed. 2d 343 (1972). *See* 477 U.S. at 65-66, 106 S. Ct. at 2405.")

The Third Circuit reached just such a conclusion in *Abramson v. William Paterson College*

*of New Jersey*, 260 F.3d 265 (3d Cir. 2001), saying:

> We have yet to address a hostile work environment claim based on religion. However, Title VII has been construed under our case law to support claims of a hostile work environment with respect to other categories (*i.e.*, sex, race, national origin). We see no reason to treat Abramson's [religiously-]hostile work environment claim any differently, given Title VII's language. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting employers from discriminating against an individual because of "race, color, religion, sex, or national origin."). Therefore, we apply the well-established framework for hostile work environment claims with respect to other protected categories to our analysis of a hostile work environment claim made on account of religion.

*Abramson*, 260 F.3d at 276 n.5; *see also Durant v. NYNEX and Bell Atlantic Corp.*, 101 F. Supp. 2d 227, 234 (S.D.N.Y. 2000) (evaluating a religiously-hostile work environment claim under a generally-applicable prima facie test); *Sanders v. Women's Treatment Center*, 9 F. Supp. 2d 929, 942 (N.D. Ill. 1998) (same).

> Whether or not the plaintiff's work environment may be considered "hostile" for purposes of Title VII is an assessment that depends on the totality of the circumstances. *Harris* [*v. Forklift Systems, Inc.*], 510 U.S. [17,] 23, 114 S.Ct. [367,] 371 [126 L. Ed. 2d 295 (1993) (holding that a Title VII hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment")]; *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir.1993). Factors pertinent to this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S. Ct. at 371; *Saxton*, 10 F.3d at 534. Whether, on balance, the harassment was "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment" (*Meritor*, 477 U.S. at 67, 106 S. Ct. at 2405 (internal quotation marks and citations omitted)) must be judged both from an objective viewpoint (*i.e.*, that of the reasonable person) and from the subjective viewpoint of the plaintiff herself. *Harris*, 510 U.S. at 21-22, 114 S. Ct. at 370; *Saxton*, 10 F.3d at 534 (collecting cases).

*Venters v. City of Delphi*, 123 F.3d at 975-76 (bracketed alterations added).

Admittedly, the facts of this case are not as egregious as those addressed by the Seventh

Circuit in *Venters*; even so, this court concludes, on the basis of the evidence summarized in paragraphs (1) through (9) of Section I *supra*, that a reasonable jury could characterize plaintiff's work environment as religiously hostile and abusive. Like the supervisor in *Venters*, Christopher Miller repeatedly subjected plaintiff to lectures about her prospects for salvation during working hours, made highly personal inquiries into her private life (*e.g.*, the legitimacy of her children, and whether a prior marriage had been terminated by divorce *versus* the doctrine of annulment sanctioned by the Catholic Church), and "strongly suggest[ed] [she] talk with God." Without undertaking an exhaustive review of all of the evidence that might be pertinent to the assessment, the court concludes that a reasonable person in plaintiff's position could have found her work environment to be hostile and abusive.

Thus, the only remaining issue is whether the corporate employer, ATSI, Inc., may be held responsible for the hostile work environment. Here, the court turns to cases discussing sexual harassment for guidance. In the usual case, the standards for determining an employer's liability for religious harassment, like the standards for sexual harassment, may turn upon the answers to as many as four questions. First, what was the harasser's status in the employer's workplace *vis-a-vis* the plaintiff-victim: was he a high-ranking official in the upper echelons of the employer's organization, a supervisor, or merely a co-worker? Second, if the harasser was a supervisor, did an adverse, "tangible employment action" occur? Third, if the harasser was a supervisor, but the harassment did not culminate in an adverse, "tangible employment action," what was the employer's response to the harassment? Finally, if the harasser was merely plaintiff's co-worker, did the employer know of the harassment (either actually or constructively) and take prompt and appropriate remedial action? The Eleventh Circuit's decision in *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d

1269 (11th Cir. 2002), provides an instructive summary of some of the relevant principles.

> An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998). The employer will be strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim. *See id.* at 807, 118 S. Ct. at 2293. However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S. Ct. at 2292-93. Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000). Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. *See id.*

*Miller*, 277 F.3d at 1278; *see also Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000).

> Generally, sexual harassment comes in two forms: harassment that does not result in a tangible employment action (traditionally referred to as "hostile work environment" harassment), and harassment that does result in a tangible employment action (traditionally referred to as "*quid pro quo*" harassment). *See generally Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760-63, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).
>
> All harassment by co-workers necessarily falls into the first *Ellerth* class, as co-workers cannot take employment actions against each other. *See id.* at 762, 118 S. Ct. 2257 ("[O]ne co-worker . . . cannot dock another's pay, nor can one co-worker demote another. Tangible employment actions fall within the special province of the supervisor."). Harassment by supervisors, on the other hand, can fall into either category. This distinction is important because if [the alleged harasser] was a co-worker, rather than [the plaintiff's] supervisor, [the plaintiff's] claim can only be for hostile environment or non-tangible employment action harassment. If [the alleged harasser] was a supervisor, [the plaintiff's] claim may be for *quid pro quo* or tangible employment action harassment. This in turn is important because [the defendant employer] may utilize an affirmative defense if the alleged harassment was

without a tangible employment action, but . . . would be strictly liable if the alleged harassment resulted in a tangible employment action.

*Johnson*, 234 F.3d at 508.

However, if the harasser was in the upper echelons of management — one who was "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy" — then the employer is strictly liable, regardless of the form the harassment took (*quid pro quo* or hostile environment), and regardless of whether it resulted in an adverse, "tangible employment action." *Faragher*, 524 U.S. at 789, 118 S. Ct. at 2284 (citing *Harris*, 510 U.S. at 19, 114 S. Ct. at 369 (harasser was president of the corporate employer); *Burns v. McGregor Electronic Industries, Inc.*, 955 F.2d 559, 564 (8th Cir. 1992) (harasser was owner of employer-company); *Torres v. Pisano*, 116 F.3d 625, 634-35 & n.11 (2d Cir. 1997) (observing that a supervisor may hold a sufficiently high position "in the management hierarchy of the company for his actions to be imputed automatically to the employer"); *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir. 1983) ("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior," the plaintiff must demonstrate "the propriety of holding the employer liable")); *see also Ellerth*, 524 U.S. at 758, 118 S. Ct. at 2267 (referring to those agents of the employer whose "high rank in the company makes him or her the employer's alter ego").

> This doctrine encompasses two categories of officials. The first are individuals who are the officers of the corporate or other entity, such as directors, owners, partners, or corporate officers.
>
> The second group are those other individuals of such "high rank" or "high position" that their actions may fairly be deemed the actions of the employer. *Faragher* and *Ellerth* identify this as a group for whose actions the corporate or other entity will be legally accountable, but provide no further guidance regarding such individuals.

Philip J. Pfeiffer (ed.), *Lindemann & Grossman's Employment Discrimination Law Third Edition*

515 (Supp. 2000).

Christopher Miller, of course, is the founder, owner, and president of ATSI, Inc.[47] Accordingly, defendant may be held strictly liable, if the jury concludes that plaintiff was subjected to a religiously hostile work environment.

### III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted in part and denied in part. An appropriate order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __15th__ day of January, 2003.

_____
United States District Judge

---

[47] Plaintiff's evidentiary submissions, Tab 2 (Miller deposition), at 12.